UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LESLIE LAZAAR and DONNA TROPEANO-TIRINO, individually and on behalf of all others similarly situated, as a Collective and Class representative,<br><br>     Plaintiffs,<br><br>   -against-<br><br>THE ANTHEM COMPANIES, INC., EMPIRE HEALTHCHOICE HMO, INC. d/b/a EMPIRE BLUE CROSS BLUE SHIELD HMO AND EMPIRE BLUE CROSS HMO, and HEALTHPLUS HP, LLC d/b/a EMPIRE BLUECROSS BLUESHIELD HEALTHPLUS AND EMPIRE BLUECROSS HEALTHPLUS,<br><br>     Defendants. | 22-CV-3075 (JGLC)<br><br>**OPINION AND ORDER** |

JESSICA G. L. CLARKE, United States District Judge:

This case is about whether registered nurses performing utilization review work using, in part, their medical-based knowledge, to independently approve claims, are properly classified as exempt employees under the Fair Labor Standards Act and the New York Labor Law. These laws generally require employers to adhere to minimum wage and overtime requirements. However, they create certain exemptions, including an exemption for "professionals" who use advanced knowledge in a field of science or learning that is typically obtained through specialized instruction.

Utilization review is the process by which insurance companies review insurance claims for benefits, performed by assessing a patient member's clinical files against certain medical criteria. Plaintiffs, registered nurses who performed utilization review work for Anthem, Inc., were classified by Anthem as exempt and denied overtime wages. Plaintiffs argue that despite

their status as registered nurses, the actual duties they performed render the exempt classification improper. They bring this suit on behalf of themselves and a putative class of about 300 others registered nurses working for Anthem as reviewers. The parties now cross-move for summary judgment.

In 2020, the Second Circuit determined that registered nurses performing utilization review work at the appeals stage are properly classified as exempt learned professionals, distinguishing these registered nurses from licensed nurse practitioners performing review work without authority to make final approvals. *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122 (2d Cir. 2020). Plaintiffs argue that *Isett* is not controlling here because (1) they did not perform appeals review, but first-level review and (2) unlike in *Isett,* their licensed nurse practitioner counterparts at Anthem *did* have authority to make final approvals. While the second distinction is appreciated, ultimately, *Isett* is controlling, and the analogous facts that gave rise to the exemption in *Isett* also exist here. For that reason and as further described herein, Defendants' motion for summary judgment is GRANTED, and Plaintiffs' motion is DENIED. The motions regarding class certification are DENIED as moot. The unopposed motions to seal are GRANTED.

## BACKGROUND

The following facts are taken from the parties' joint statement of material facts (ECF No. 150, "SMF"), Plaintiffs' statement of material facts (ECF No. 164, "PSMF"), and, where facts are disputed, from the record.

## I.    Facts

Anthem, Inc. ("Anthem") (now known as Elevance Health, Inc.) is a national multi-line health insurance company that provides managed care programs and related services. ECF No.

150 ("SMF") ¶ 1. As a part of its business of administering health insurance plans, Anthem

employs utilization reviewers, such as Plaintiffs Leslie Lazaar and Donna Tropeano-Tirino. *Id.*

¶ 9. These utilization reviewers conduct first-level medical necessity reviews, which means that

they determine whether a health insurance request should be approved or not. PSMF ¶¶ 2–3.

Most utilization reviewers with registered nurse ("RN") licenses, like Plaintiffs, are assigned one

of the following job titles: Nurse Medical Management I ("NMM I"); Nurse Medical

Management II ("NMM II"), Nurse Medical Management Senior ("NMM Senior"), or Nurse

Medical Management Lead ("NMM Lead") (generally, "NMM" or the "NMM roles"). SMF

¶ 10. Anthem paid NMMs employed in New York, such as Plaintiffs, a salary and classified them

as exempt from overtime wages under the Fair Labor Standards Act ("FLSA") and the New York

Labor Law ("NYLL"). *Id.* ¶¶ 11, 13. This case is about whether, based on their job duties,

Plaintiffs were properly classified as exempt, or whether they are owed overtime wages.

### A. Utilization Review Process

Utilization reviewers handle insurance authorization requests submitted by healthcare

providers on behalf of members covered under a specific health insurance plan. PSMF ¶ 5.

According to Anthem, "all reviews should be the same. They should follow the same steps,

document in the same order." ECF No. 152-45 ("Lee Dep.") at 79:6–19; PSMF ¶ 8. The review

process begins with a healthcare provider submitting a request for authorization. PSMF ¶ 9. Once

a utilization reviewer receives a request, the reviewer identifies the medical necessity criteria

applicable to the request. *Id.* ¶ 10. The type of request will determine which guideline, or

guidelines, and criteria a reviewer must apply to the review. *Id.* ¶ 11. A computer system will

populate guidelines for a diagnosis or procedure, but reviewers are instructed that guidelines

populated may be "not appropriate for your case," in which case reviewers may independently

search for the correct guidelines. *Id.* ¶ 11; ECF No. 152-10, 155-8 ("MCG Embedded Guidelines") at 318954.[1] In the event of multiple diagnoses and more than one potentially applicable guideline, reviewers are trained to "[a]lways use an applicable [specific recovery] guideline before a [general recovery guideline]." PSMF ¶ 12; ECF No. 152-11, 155-9 ("IRRA Tip Sheet") at 7121.

Once the right guideline has been identified, the reviewer applies the applicable medical necessity criteria to the clinical information submitted by the health care provider. PSMF ¶ 13. Reviewers document reviews in Anthem's management system according to specific documentation standards and templates, noting which criteria were or were not met. *Id.* ¶ 19. The criteria are embedded electronically into Anthem's platform and contain "criteria met" and "criteria not met" checkboxes for reviewers to mark when processing a request. *Id.* ¶ 14. A feature called "PhraseExpander" operates as a documentation template. *Id.* ¶ 20. Anthem represents that PhraseExpander, which was not in place when Plaintiffs worked for Anthem, is merely used to organize the pertinent clinical data that a nurse relied on. *Id.*, Def. Resp. to ¶ 20. Plaintiffs also state that Anthem has implemented a system called Intelligent Clinical Assistant, an AI tool that can automatically approve certain requests where all criteria are met. PSMF ¶ 30. Defendants state to the contrary, that while they employ programs that assist authorizations, a reviewer is required to make a clinical decision. *Id.*, Def. Resp. to ¶ 30 (citing ECF No. 163 ¶ 10; ECF No. 163-9).

In assessing criteria, reviewers review the medical data of the patient. ECF No. 148-17 ("Paluch Dep.") at 105:20–106:24. The Minimum Necessity Requirements train reviewers to

---

[1] Unless otherwise indicated, citations refer to the last several digits of the relevant Bates page number.

use, disclose, and request only the minimum amount of medical information necessary to complete the review, "unless they can justify that the entire record is needed for a particular purpose." ECF No. 152-13, 155-11 ("Minimum Necessity Requirements") at 326470. This data could be hundreds of pages long. ECF No. 148-13 ("Lanoue Dep.") at 94:25–95:4.

Reviewers must apply "objective and evidence-based criteria" and take "individual circumstances . . . into account," as well as consider factors such as "[c]omorbidities, [c]omplications, [p]rogress of treatment, [p]sychosocial situation, and [h]ome environment . . . ." ECF No. 152-15, 155-13 ("UM Standards and Elements") at 21379–80; PSMF ¶ 26. If criteria are not met, reviewers cannot approve the request. ECF No. 136-34 ("Conklin Dep.") at 76:21–25 (Feb. 21, 2024). Standard audits assess if reviewers applied criteria appropriately. PSMF ¶ 31.

However, reviewers are allowed to use their nursing judgment in applying the criteria. ECF No. 148 ¶ 32; ECF No. 148-25; *see also* ECF No. 163-5 at 11106 ("The guidelines are not designed to be used in isolation, but rather in conjunction with clinical judgment."). And reviewers themselves testified that they "have to put a lot of nursing judgment" to determine if criteria are met. ECF No. 163-8 ("Andrews Dep.") at 111:24–113:15. Reviewers testified that they have used their nursing background to understand the guidelines and the conditions that meet the criteria, including background that helps them understand medical terminology as well as to identify conditions and symptoms. Paluch Dep. at 105:9–106:22; ECF No. 148-20 ("Skiff Dep.") at 76:15–79:11 (describing the process of identifying a "severe electrolyte abnormality" by making deductions based on doctor's notes about potassium levels); ECF No. 148-22 ("Suh Dep.") at 42:14–43:11 (testifying that her nursing background helps her understand "medical jargon" that the average person who does not work in healthcare does not understand); ECF No.

148-21 ("Smith Dep.") at 50:22–51:8 (stating that an RN license helped a reviewer to be effective by, for example, enabling reviewer to know what a "myocardial infarction" is).

If the clinical information meets the applicable medical necessity criteria, the reviewer can approve the requested benefit or service, unless a rule requires the reviewer to send the request to a Medical Director. PSMF ¶ 15. If the clinical information does not meet the applicable criteria or it is not clear whether the criteria are met, then reviewers must "pend" the review to a Medical Director. *Id.* ¶ 16; ECF No. 152-43 ("Robinson Dep.") at 144:7–18. However, before involving a Medical Director, a reviewer is expected to try to obtain additional clinical information. Robinson Dep. at 144:24–145:24. A reviewer may also "advocate [to a Medical Director] for whatever reasons they see as a clinician, or their clinical judgment is telling them . . . if they believe a request should be approved[.]" *Id.* at 147:13–24. Ultimately, reviewers cannot deny an authorization request—only a Medical Director, who is a physician, can issue a denial. *Id.*

The review process ends with the reviewer sending a communication to the provider or member informing them if the request is approved or denied. PSMF ¶ 21. If denied, nurse reviewers discuss next steps and available options with the member. Lee Dep. at 70:12–20.

### B.  Requirements for Utilization Reviewers

Reviewers such as Plaintiffs worked on health plans subject to review standards set by the National Committee for Quality Assurance ("NCQA"), a national accrediting organization. PSMF ¶ 23. The NCQA utilization management standards cover various aspects of Anthem's utilization management program, including structure, clinical criteria, qualifications of review professionals, timeliness of decisions, documentation of reviews, consistency of reviews and communication of review decisions. *Id.* ¶ 24. To remain NCQA accredited, Anthem has

implemented rules that govern review work consistent with NCQA standards, although there are aspects of review work for which NCQA factors are not applicable. *Id.* ¶ 26; ECF No. 152-15, 155-13 ("UM Standards and Elements"). Some of these rules are discussed above, such as the requirement to apply certain evidence-based criteria. UM Standards and Elements at 21379–80.

The NCQA also sets the minimum standards for which professionals can review authorization requests. PSMF ¶ 56. The NCQA requires "licensed health professionals" for this work. UM Standards and Elements at 212386. Moreover, the "policies and procedures specify that the organization uses licensed health care professionals to make UM decisions that require clinical judgment." *Id.* at 212387. Otherwise, staff who are not qualified as or under the supervision of appropriately licensed health professionals can only approve services "when there are explicit UM criteria and no clinical and no clinical judgment is required." *Id.*

That said, utilization review work is distinct from case management work. PSMF ¶ 55. Reviewers do not provide patient care or patient education, perform "head-to-toe" nursing assessments, provide medical treatment or medical advice, provide nursing care, supervise or teach others who provide nursing care, or administer medications to patients or health insurance members. *Id.* ¶ 51. In that sense, reviewers do not practice traditional nursing as defined by New York State Law. *Id.* at 36. Moreover, reviewers can perform medical necessity reviews even if the reviewer is not licensed as a nurse in the state where the patient member is receiving care. *Id.* ¶ 53. Reviewers are not allowed to diagnose or provide direct patient care. *Id.* at 37. And reviewers do not typically communicate with the members submitting authorization requests, although some reviewers have interacted directly with members to explain denials. *Id.* ¶ 52 & at 38; Conklin Dep. (Mar. 13, 2024) at 20:8–17.

Neither New York state rules and regulations, nor NCQA accreditation requirements, nor Anthem's internal policies require that medical necessity reviews be performed by those with RN licenses. SMF ¶ 34–35. However, Anthem required NMM nurses such as Plaintiffs to possess and maintain an RN license. ECF No. 163-17 at 19, Response to Interrogatory No. 15.

Once hired, Anthem's reviewers are trained by Anthem on how to perform their job "from beginning to end." PSMF ¶ 45; Conklin Dep. (Feb. 21, 2024) at 54:8–23. Anthem provides utilization reviewers with policies, procedures, desktop processes, quick reference guides, tools, and resources for performing reviews. PSMF ¶ 46. Defendant represents that these trainings are on relevant systems and processes and are not meant to substitute prior nursing education. *Id.*, Def. Resp. to ¶¶ 45, 47. Nurse reviewers testified that their nursing education, taking classes such as anatomy, physiology, and microbiology, demanded the absorption of large amounts of information and required passing demanding skills tests. Skiff Dep. at 108:3–109:20.

All reviewers must pass the mandatory interrater reliability ("IRR") test. PSMF ¶ 32; SMF ¶ 31–32. IRR is defined as the "degree of agreement between two or more Health Care Management (HCM) clinical staff when applying medical necessity criteria on a given service request." PSMF ¶ 33. According to Anthem, the IRR test uses hypotheticals to measure a reviewer's ability to decipher clinical information and identify the most appropriate guideline to apply based on an individual's medical records. PSMF, Def. Resp. to ¶ 27; ECF No. 163 ¶ 13 & Ex. 11. IRR assessments endeavor to promote knowledge of criteria, reduce risk of inconsistent guideline application, and to identify training needs. PSMF ¶ 35; Def. Resp. to ¶ 35. Reviewers who do not pass the IRR test are retrained on how to use the guidelines appropriately. *Id.* ¶ 36. Alternatively, a manager reviews the test errors with the reviewer to ensure they understood the errors. ECF No. 163 ¶ 14; ECF No. 163-12 ("Pushman Dep.") at 55:20–56:10.

### C. Licensed Practical Nurses (LPNs) as Utilization Reviewers

Plaintiffs state that "licensed health professionals" as defined by the NCQA requirements includes Licensed Practical Nurses ("LPNs"). PSMF ¶ 56. Each named Plaintiff is aware of two LPNs who were hired on an NMM review team. *Id.*, Def. Resp. to ¶ 59. There is also testimony about one more person who worked on an NMM team and was an LPN, but without additional details. ECF No. 152-48 at 15:21–16:1. Otherwise, LPN reviewers were generally assigned the job title of Licensed Utilization Reviewer ("LUR"). *Id.* ¶¶ 59–60. Anthem represents that LUR reviewers and NMM reviewers had different qualifications and duties, with LURs handling less complex cases and adhering to specific criteria. ECF No. 163 ¶ 21; ECF No. 163-15 at 4.

Like RN reviewers, LPN reviewers also process authorization requests by applying medical necessity criteria to submitted documentation. PSMF ¶ 61. Like RN reviewers, LPN reviewers underwent the same training provided by Anthem. Lee Dep. at 68:7–9, 82:4–9, 83:12–15; ECF No. 152-47 ("Mitola Dep.") at 85:22–86:22. RN reviewers and LPN reviewers followed the same review process and criteria and were subject to the same documentation standards and productivity metrics. PSMF ¶¶ 63–64. Like RN reviewers, LPNs could also approve requests, but must send the request to a Medical Director if criteria are not met. PSMF ¶ 65; ECF No. 152-40, 155-38 at 138026 (noting that LPNs can also effectuate approvals). Defendants represent that LPNs and RNs, however, were not afforded the same level of authority, with LPNs approving simpler cases that adhered to specific criteria. ECF No. 163 ¶ 21; ECF No. 163-15 at 4. Some LPNs acted as managers supervising utilization review teams consisting of NMMs with RN licenses. PSMF ¶ 66; ECF No. 152-52 at 165:15–166:13, 312:9–313:12; ECF No. 159-25 at 77:23–78:18.

### D. Exemption Classifications & Overtime

LURs are paid hourly and classified as non-exempt. PSMF ¶ 67. On the other hand, Plaintiffs, NMMs, are paid a salary and classified as exempt. SMF ¶¶ 11, 13. Plaintiffs testified that when hired, they understood their salary to cover all hours worked each week, including those in excess of forty hours. ECF No. 148 ¶ 79; ECF No. 148-5 ("Lazaar Dep.") at 171:9–12. & Ex. E; ECF No. 163 ¶ 24; ECF No. 163-18 at 74:13–17. Plaintiffs state that reviewers such as themselves regularly worked over forty hours per week to meet productivity metrics. PSMF ¶ 74.

## II. Procedural History

On April 13, 2022, Plaintiff Leslie Lazaar filed suit on behalf of herself and all other utilization review nurses who worked for Anthem in New York, alleging violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). ECF No. 1. Plaintiff twice amended her Complaint on May 27, 2022 and July 15, 2022 to add additional defendants and allegations. ECF Nos. 12, 21.

On August 14, 2022, Defendants filed a motion for judgment on the pleadings, contending that Plaintiff and the putative FLSA collective members were exempt from overtime wages. ECF No. 28. The Court denied Defendants' motion, finding that, taking all the allegations as true, this case is distinguishable from the Second Circuit's decision in *Isett v. Aetna Life Insurance Company* (discussed herein) and that judgment on the pleadings is not appropriate. ECF No. 38 ("12(c) Order") at 5–8.

On June 22, 2023, the Court conditionally certified an FLSA collective and authorized notice to issue. ECF No. 52. On April 3, 2024, Plaintiff filed a third amended complaint to add Opt-In Plaintiff Donna Tropeano-Tirino as an additional Named Plaintiff and proposed Class

Representative. ECF No. 90. Plaintiffs state that as of May 20, 2024, there were approximately 358 putative class members. ECF No. 124 ¶ 7.

On January 24, 2025, Defendants moved to decertify the conditionally certified collective while Plaintiffs moved to certify the class, which Defendants oppose. ECF Nos. 119, 122, 139. On February 28, 2025, parties also filed cross-motions for summary judgment, with Plaintiffs seeking partial summary judgment. ECF Nos. 143, 146. The parties have filed a number of motions to seal documents filed in connection with their motions regarding class certification and summary judgment. ECF Nos. 125, 131, 137, 140, 151, 153, 160.

## LEGAL STANDARD

In considering cross-motions for summary judgment, a court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Jingrong v. Chinese Anti-Cult World All. Inc.,* 16 F.4th 47, 56 (2d Cir. 2021) (citing *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)). To prevail on a motion for summary judgment, a movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 322. When the movant properly supports her motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact,

11

a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)).

## DISCUSSION

The Court first addresses the motions for summary judgment, finding that because Plaintiffs were properly classified under the professional exemption, all claims are dismissed. The motions regarding class certification are, therefore, denied as moot. Finally, the unopposed motions to seal documents containing sensitive business information are granted.

## I.    Plaintiffs Are Exempt Employees Under the FLSA and NYLL

Because Plaintiffs are seeking overtime wages that they would only have been owed as non-exempt employees under the FLSA and NYLL, the first (and dispositive) question is whether Plaintiffs were properly classified as exempt employees by Anthem.

The FLSA exempts from its minimum wage and overtime requirements any "employee employed in a bona fide executive, administrative, or professional capacity . . . ." 29 U.S.C. § 213(a)(1). The NYLL incorporates all FLSA exemptions.[2] *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 160 (S.D.N.Y. 2014). A claim that an employee is exempt under the FLSA is an affirmative defense for which the employer bears the burden of proof. *See id.* Although courts historically construed exemptions narrowly and against employees, since 2018, the Supreme Court has held that courts must give exemptions a "fair (rather than a 'narrow') interpretation." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88 (2018) (internal citation omitted).

---

[2] Plaintiffs conceded that if Defendants meet the exemption under the FLSA, this also disposes of Plaintiffs' NYLL claims. ECF No. 157 at 3 n.3.

Employers asserting this affirmative defense must prove exemption by a preponderance of the evidence. *EMD Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025). In determining whether this exemption applies, the Second Circuit has instructed that "the question of how an employee spends her working time is a question of fact and the question of whether an employee's primary duty excluded her from the overtime benefits of the FLSA is a question of law." *Isett v. Aetna Life Insurance Company*, 947 F.3d 122, 129–30 (2d Cir. 2020) (cleaned up).

Defendants contend that Plaintiffs fall under the learned profession exemption as registered nurses. In order for this exemption to apply, Defendants must show that Plaintiffs' employment met both a "salary" test and a "duties" test. *Zubair v. EnTech Eng'g P.C.*, 808 F. Supp. 2d 592, 596 (S.D.N.Y. 2011). The "salary" test requires that the employee be compensated "on either a fee or salary basis" and "must receive no less than $455 per week[.]" *Id.* at 597 (citing 29 C.F.R. § 541.300(a) (2025)). It is undisputed that Plaintiffs' pay exceeds this threshold. *See* SMF ¶ 12; *see generally* ECF No. 147 ("Pls. Mot."). Plaintiffs instead argue that their employment fails to meet the "duties" test.

Under the "duties" test, the exempt employee's "primary duty" must be exempt work— that is, the "the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized instruction." 29 C.F.R. § 541.301(a) (2025). This test has three elements: "(1) [t]he employee must perform work requiring advanced knowledge; (2) [t]he advanced knowledge must be in a field of science or learning; and (3) [t]he advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." *Id.* § 541.301(a)(1)–(3); *see also Zubair,* 808 F. Supp. 2d at 598. All three prongs of this test must be satisfied for the professional exemption to apply. *Pippins v. KPMG, LLP*, 759 F.3d 235, 238 (2d Cir. 2014). "Registered nurses who are registered

by the appropriate State examining board generally meet the duties requirements for the learned profession exemption." 29 C.F.R. § 541.301(e)(2) (2025). By contrast, "licensed practical nurses and other similar health care employees . . . generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations." *Id.*

Plaintiffs argue that their employment meets none of the three prongs of the duties test. First, Plaintiffs characterize their primary duty as processing insurance requests, which is "routine mental work requiring Plaintiffs to apply well-established medical criteria within a closely prescribed utilization review process . . . ." Pls. Mot. at 11. Plaintiffs argue that this work lacks the requisite level of discretion of judgment for the exemptions, and Anthem's process is specifically designed to limit the exercise of discretion and judgment. *Id.* at 11–14. Second, Plaintiffs argue that the knowledge required to process authorization requests only requires LPN-level knowledge and on-the-job training. *Id.* at 14–16. Third, Plaintiffs argue that review work is not in a field of science or learning and instead falls in the insurance field. *Id.* at 16.

The Court must consider each argument in light of *Isett v. Aetna Life Insurance Company*. In *Isett*, the Second Circuit considered the similar question of whether an appeals nurse consultant working for Aetna Life Insurance Company ("Aetna") falls under the professional exemption. Isett was an RN responsible for performing utilization review at the appeals stage— that is, reviewing appeals of denials of authorization for medical services. 947 F.3d 122, 126 (2d Cir. 2020). In doing so, the appeals nurse reviews the patient's file with clinical information and the initial review resulting in the claim's denial. *Id.* The appeals nurse would then locate the relevant criteria in Aetna's clinical guidelines and apply the criteria to the information in the file, to determine whether the requested services were medically necessary. *Id.* All conclusions were

documented in template form. *Id.* If the request for coverage did not meet the relevant criteria or the result was unclear, the appeals nurse was required to forward the appeal to a medical director for further review and a final decision. *Id.* Working alongside RNs like Isett were nurse associates who were LPNs, also performing appeal review. *Id.* These nurse associate LPNs, however, could not approve coverage requests without further review. Nurse associates needed to forward the appeal to a nurse consultant or a medical director for final approval. *Id.* at 126–27.

Isett argued that her work as an appeals nurse did not require advanced knowledge for the purposes of the professional exemption, and did not require specialized instruction. *Id.* at 129. Isett did not dispute that her work was "in a field of science or learning." *Id.* The Second Circuit ultimately determined that Isett's work did require advanced knowledge and called on knowledge typically procured through specialized instruction, and that Isett's role as an appeals nurse was properly classified as exempt. *Id.* at 138–39. Because the facts in this case are analogous to those in *Isett*, and for the reasons stated below, the exemption applies.

## A. Work Requiring Advanced Knowledge

The phrase "work requiring advanced knowledge" means:

> work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances.

29 C.F.R. § 541.301(b) (2025). In interpreting and applying this definition, the Second Circuit in *Isett* considered its prior analysis from *Pippins v. KPMG, LLP*, 759 F.3d 235 (2d Cir. 2014), and drew two conclusions: First, "the burden of satisfying the professional exemption's advanced-knowledge requirement by application of the 'discretion and judgment' standard is not particularly stringent," at least when compared to the "discretion and independent judgment"

standard applied to administrative employees. *Isett,* 947 F.3d at 131. Second, the inquiry does "not necessarily look to the freedom of an employee to deviate from the employer's policies. Rather, the professional exemption requires the exercise of discretion and judgment *characteristic of the learned profession at issue.*" *Id.* (cleaned up and emphasis in original). Accordingly, the Second Circuit held that the advanced-knowledge requirement is to be assessed in two steps: "(1) we identify what qualities or skills are characteristic of the profession at issue (in this instance, registered nursing); and (2) we determine whether these distinctive qualities or skills are manifested in the performance of the employee's primary duty (here, conducting utilization review and approving insurance coverage for medically necessary services)." *Id.*

As to the first step, the Second Circuit held that registered nurses are not endowed as "professional" only when they perform traditional clinical duties. *Id.* at 132. Rather, "the practice of registered nursing is characterized primarily by the ability to act independent of direction, or under minimal supervision, on the basis of collected clinical data." *Id.* at 133. "The ability to act independently requires substantive command of clinical data, which allows registered nurses, among other things, to provide, supervise, modify, or approve the administration of medically necessary services under limited supervision."[3] *Id.* This holding applies with equal force in this case, which is also about whether Plaintiffs, as registered nurses, are engaging in work that invokes the advanced knowledge of their profession.

On the second step, the court in *Isett* examined whether nurse consultants like Isett act in a manner that reflects the "central characteristic of registered nurses"—that is, whether Isett

---

[3] Plaintiffs argue that *Isett* erred by failing to consider the actual duties of utilization review work independently from the profession of registered nursing. Pls. Mot. at 18. To the contrary, this entire discussion section of *Isett* is about identifying the core of the profession of registered nursing in order to analyze why the "actual duties" of utilization review work fall within the profession. And, in any event, the Court is bound by *Isett*.

"acted independently —or, at a minimum, under limited supervision—on the basis of collected clinical information when she approved insurance coverage of medical services." *Id.* at 134. This Court now must answer that same question.

Despite some differences between Plaintiffs and Isett, the Court reaches the same conclusion. And that is because the fundamental reason underlying the Second Circuit's opinion also applies here: Plaintiffs, like Isett, must apply medical criteria of "highly technical guidelines to a patient's unique and varying facts . . . ." *Id.* at 134. Plaintiffs, like Isett, must decide: "(1) whether certain medical criteria in the clinical guidelines are satisfied; (2) whether it is unclear if the criteria in the guidelines are satisfied; and (3) whether the clinical guidelines themselves are unclear." *Id.*

Plaintiffs argue that the Anthem process is so structured as to circumscribe decision-making ability. PSMF ¶¶ 13–14, 19–20; Pls. Mot. at 11–13. And Plaintiffs point to the auditing of reviewers and the IRR test, which reflect Anthem's preference for conformity to the use of Anthem's prescribed process. *Id.* at 13. But even when tasks "can be broken down into component parts" such that reviewers "are provided with step-by-step instructions for performing their functions effectively," that "does not mean that in performing these tasks [reviewers] do not demonstrate their ability to act independently on the basis of clinical data and the trained intellect that is characteristic of registered nurses." *Isett,* 947 F.3d at 135 (cleaned up).

For Plaintiffs, their judgment is required at multiple stages. Plaintiffs first must determine the correct guideline to apply to their case, a process in which they may be required to independently search for correct guidelines. PSMF ¶ 11; MCG Embedded Guidelines at 318954. Plaintiffs must then review patient files that can sometimes be hundreds of pages long in order to apply guideline criteria. Lanoue Dep. at 94:25–95:4. During this application, Plaintiffs must take

"individual circumstances . . . into account," as well as consider factors such as "[c]omorbidities, [c]omplications, [p]rogress of treatment, [p]sychosocial situation, and [h]ome environment." UM Standards and Elements at 21379–80; *see* PSMF ¶ 26. The policies caution that "guidelines are not designed to be used in isolation, but rather in conjunction with clinical judgment." ECF No. 148 ¶ 32; ECF No. 148-25; *see also* ECF No. 163-5 at 11106. And reviewers themselves testified that they "have to put a lot of nursing judgment" in to determine if criteria are met. Andrews Dep. at 111:24–113:15. Finally, when deciding when to refer cases to a Medical Director, Plaintiffs must "deploy advanced knowledge and practice professional judgment precisely in order to identify the unique circumstances that necessitate seeking further advice or transferring the file to a medical director." *Isett,* 947 F.3d at 135 (cleaned up). A reviewer may also "advocate [to a Medical Director] for whatever reasons they see as a clinician, or their clinical judgment is telling them . . . if they believe a request should be approved[.]" Pushman Dep. at 147:13–24. Plaintiff Lazaar testified that as a part of her duties, she would regularly participate in rounds and present information to Medical Directors, such as summarizing client medical files. Lazaar Dep. at 207:8–213:5.

The factual differences between *Isett* and this case are insufficient to remove Plaintiffs' case from *Isett's* ambit. As pointed out by Plaintiffs, there are two discussion-worthy differences. *See* Pls. Mot. at 18–19. The first is that Isett worked as an appeals nurse handling requests to overturn denials, while Plaintiffs here do first-level review work. This difference is insignificant. As described by the record, first-level review work and appeal review work are essentially identical. Reviewers at both levels are assessing patient files against medical criteria in guidelines. There is no evidence anywhere to suggest first-level review work demands any less care, scrutiny, skill, or knowledge than appeal review work. To the contrary, as discussed in the

previous paragraphs, Defendants have provided ample evidence that first-level review work requires clinical judgment and technical knowledge. Furthermore, both Plaintiffs and the appeals-level nurses in *Isett* have discretion to approve (but not deny) claims on their own—a fact the Second Circuit repeatedly pointed to in concluding that the nurses met the "discretion and judgment" standard for the exemption. *Isett*, 947 F.3d at 135–36.

The second difference is more significant: In *Isett,* the Second Circuit considered that LPN nurse associates who performed review work were, unlike RNs, not permitted to make any final approvals. Here, there is evidence that LPNs, like RNs, could also make final approvals. PSMF ¶ 65; ECF No. 152-40; ECF No. 155-38 at 138026. However, *Isett* does not suggest that the LPNs' ability to make a final approval would have been fatal to Aetna's ability to prove this first prong. Isett merely points out that in her case, nurse consultants who are RNs and nurse associates who are LPNs do not perform the same job and the function of an LPN cannot support Isett's arguments. *Isett,* 947 F.3d at 135. For this prong of the "duties" test, the dispositive issue in *Isett* was whether Isett had the "ability to act independently, or under limited supervision, on the basis of collected clinical data." *Id.* at 136. Here, even though evidence indicates that LPNs can also make final approvals, that does not change the fact that RN Plaintiffs had the ability to act independently, under limited supervision, on the basis of collected clinical data. Plaintiffs' job required the use of advanced knowledge, satisfying the first prong of the primary duty test.

### B. Knowledge Customarily Acquired Through Specialized Instruction

The primary duties test requires that Plaintiffs' applied advanced knowledge be "customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a) (2025). This prong "is satisfied where the employee's primary duty calls on advanced knowledge that is acquired in a specialized course of study." *Isett*, 947 F.3d at 138.

The undisputed evidence shows that the work performed by Plaintiffs calls on advanced knowledge acquired in their nursing studies. Reviewers testified that they have used their nursing background to understand the guidelines and the conditions that meet the criteria, including background that helps them understand medical terminology as well as to identify conditions and symptoms. *See* Paluch Dep. at 105:9–106:15 (nursing background used to understand certain terms like "hemodynamic," and that if the reviewer did not have a medical background, he likely would not have known what it meant); *id.* at 140:5–141:6 (discussing the interpretation of the word "tachycardia" and what it may indicate for a precise heart rate number, and how that might affect application of guidelines); Skiff Dep. at 76:15–79:11 (describing the process of identifying a "severe electrolyte abnormality" by making deductions based on doctor's notes about potassium levels); Lanoue Dep. at 40:12–42:6 (stating that RN license was necessary to review medical charts against medical policy, and helped "understand what to look for, and what patients need to address diagnoses"); *id.* at 42:15–20 (testifying that a layperson cannot understand all the terms in the guidelines); Suh Dep. at 42:14–43:11 (testifying that her nursing background helps her understand "medical jargon" that the average person who does not work in healthcare does not understand); Smith Dep. at 50:22–51:8 (stating that an RN license helped a reviewer to be effective by, for example, enabling reviewer to know what a "myocardial infarction" is); Lazaar Dep. at 231:14–232:14 (testifying that her prior nursing experience helped reviewer see the "clinical picture" and identify conditions during review work).

Nonetheless, Plaintiffs contend that review work does not require a nursing degree and can be learned through on-the-job training and experience. Pls. Mot. at 14–16.

First, Plaintiffs point out that neither New York state rules and regulations, nor NCQA accreditation requirements, nor Anthem's internal policies require that medical necessity reviews

be performed by those with RN licenses. SMF ¶¶ 34–35. Defendants point out that Anthem required NMM nurses such as Plaintiffs, whose duties are different from other reviewers, to possess and maintain an RN license. ECF No. 163-17, Response to Interrogatory No. 15.

In either case, *Isett* has held that the focus under this prong "is not circumscribed to the employer's decision to require an advanced academic degree." *Isett*, 947 F.3d at 136. Instead, the focus is on whether the primary duty of the job requires "advanced knowledge that is typically acquired through a prolonged course of study." *Id. Isett* noted the "advanced knowledge" of appeals reviewers, such as:

> how to visualize a sick patient to decide, under minimal supervision, whether the patient should be admitted to a hospital, whether the correct level of care was provided, and whether the length of the hospital stay was appropriate—is derived from specialized academic instruction and comparable unsupervised clinical experience, as opposed to mere on-the-job training.

*Id.* at 136–37. And as reflected *supra*, these same skills apply in the instant case. Reviewers looked at a "clinical picture," interpreted technical terms, made inferences based on the usage of technical terms, made deductions from details in patient files, and determined "what patients need to address diagnoses." Lazaar Dep. at 231:14–232:14; Paluch Dep. at 140:5–141:6; Skiff Dep. at 79:15–78:3; Lanoue Dep. at 40:12–42:6.

Second, Plaintiff notes that once hired, Anthem's reviewers are trained by Anthem on how to perform their job "from beginning to end." PSMF ¶ 45; Conklin Dep. (Feb. 21, 2024) at 54:18–23. The record shows that for at least one department, training by Anthem comprised of six weeks of onboarding training. *Id.* at 53:9–13. Trainees reviewed computer use and the hierarchy of review. *Id.* at 55:14–16. Trainees then shadowed a more experienced reviewer, who completed reviews in the computer system. *Id.* at 56:9–57:1. When trainees were ready, they practiced navigating the system themselves, eventually moving on to live cases in their mentor's

pod. *Id.* at 57:22–58:7. Plaintiffs argue that this training is sufficient to prepare those without nursing degrees to tackle the task.

However, the testimony from Anthem employees reflects that reviewers are frequently interpreting highly technical terms, and that they may be called on to draw inferences based on details in files that can be hundreds of pages. *See, e.g.*, Skiff Dep. at 79:15–78:3 (describing the process of identifying a "severe electrolyte abnormality" by making deductions based on doctor's notes about potassium levels); Lanoue Dep. at 94:25–95:4. A few weeks of training, no matter how intensive, cannot equip an individual with the expansive breadth of medical knowledge to navigate potentially hundreds of pages of medical terminology and detail. Defendants represent that these trainings are instead meant to cover relevant systems and processes and are not meant to substitute prior nursing education. PSMF, Def. Resp. to ¶¶ 45, 47. Indeed, nurse reviewers testified that their nursing education, taking classes such as anatomy, physiology, and microbiology, demanded the absorption of large amounts of information and required passing demanding skills tests. *See, e.g.,* Skiff Dep. at 108:3–109:20. And, Plaintiffs failed to dispute with any admissible evidence that this education, not solely Anthem training, is what allowed reviewers to perform the complex reviews that this work required.

Finally, Plaintiffs argue that "Anthem's employment of reviewers with only LPN licenses proves that utilization work only requires LPN-level knowledge rather than advanced knowledge customarily acquired by a prolonged course of specialized academic instruction." Pls. Mot. at 15. This point is quite significant for this prong. When the Second Circuit determined that RN Isett, unlike her LPN nurse associate counterparts, met the requirements of this prong, the Court recognized that "[f]ar from being a 'distinction without a difference,' the ability to make a final decision about patient care under minimal supervision is precisely what distinguishes registered

nurses, whose advanced knowledge is obtained in a prolonged course of specialized study, from licensed practical nurses." 947 F.3d at 137 (cleaned up). Here, unlike *Isett,* LPNs are also able to approve requests. PSMF ¶ 65; ECF No. 152-40, 155-38 at 138026. At least one LPN even acted as a manager supervising utilization review teams consisting of NMMs with RN licenses. PSMF ¶ 66.

That said, there are three reasons why this distinction is insufficient to take this case out of *Isett's* reach. The first is that factually, for all the reasons discussed previously, reviewers can be called upon to perform tasks that call upon technical and extensive nursing education. Although the NCQA and Anthem policies do not require an RN license for all review work, the policies are explicit that individuals who are not qualified as "licensed health professionals" can only approve services as reviewers under certain circumstances: "when there are explicit UM criteria and no clinical judgment is required." UM Standards and Elements at 212386–87. Adhering to this policy, Anthem represents that LUR reviewers with LPN licenses and NMM reviewers with RN licenses had different qualifications and duties, with LURs handling less complex cases and adhering to specific criteria. ECF No. 163 ¶ 21; ECF No. 163-15 at 4.

Second, to the extent that some LPN-licensed individuals performed NMM-designated work or performed complex reviews, that does not necessarily change the exempt nature of NMM review work. In this prong's requirement that knowledge be "customarily acquired by a prolonged course of specialized intellectual instruction," "the word 'customarily' is key." *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 205 (2d Cir. 2009). *Young* noted:

> The word 'customarily' implies that in the vast majority of cases the specific academic training is a prerequisite for entrance into the profession. It makes the exemption available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry, etc., but it does not include the members of such quasi-professions as journalism in which

23

the bulk of the employees have acquired their skill by experience rather than by any formal specialized training.

*Id.* (citing 29 C.F.R. § 541.301(d)). In *Isett,* the Second Circuit likewise recognized that "the critical inquiry is not whether there might be a single or a few nurse associates who purport to perform the same duties as the nurse consultants despite not satisfying a specific set of academic requirements, but whether the vast majority of nurse consultants required a prolonged, specialized education to fulfill their role." 947 F.3d at 137 (cleaned up).

Here, Plaintiffs point out one LPN-licensed individual who was a manager, and each point out two other LPNs working on NMM teams, hired in 2013 or before. PSMF ¶ 66; ECF No. 152-52 at 165:15–166:13, 312:9–313:12; ECF No. 159-25 at 77:23–78:18. There is additional testimony about one more person who worked on an NMM team and was an LPN, but without additional details. ECF No. 152-48 at 15:21–16:1. This is among what Plaintiffs state are hundreds of NMM RNs. ECF No. 124 ¶ 7. No doubt, the "vast majority" of NMMs required a prolonged, specialized education to fulfill their role. *Isett,* 947 F.3d at 137.

Finally, even with this distinction between this case and *Isett,* the facts are simply too similar for the Court to hold that *Isett* cannot apply. The basis of the *Isett* decision was that Isett's advanced knowledge, "which enabled her to make medical-necessity determinations and approve medical treatment under minimal supervision, is at the core of the specialized training that registered nurses receive before entering their profession." *Id.* at 138. That remains true here, even if a few LPNs at Anthem were allowed to perform the same work. In other words, the fact that some individuals without RN licenses were permitted to perform Plaintiffs' work does not change what the work itself demands. And, for all the reasons discussed above, that is work requiring advanced knowledge customarily acquired through prolonged specialized instruction.

24

### C. Field of Science or Learning

For the learned professional exemption to apply, Plaintiffs' advanced knowledge used in their primary duties "must be in a field of science or learning[.]" 29 C.F.R. § 541.301(a) (2025). Plaintiffs argue that utilization review work is not such a field. Pls. Mot. at 16. The basis of this argument is that knowledge necessary to process requests falls in the insurance field and not in the medical field. *Id*. As discussed in the preceding sections, reviewers rely upon extensive medical knowledge to determine which guidelines apply and when criteria are met. Utilization review work, at least more complex review work assigned to licensed health professionals and RNs, requires advanced knowledge in a field of science.

Plaintiffs ask the Court to rely on *Learing v. Anthem Companies, Inc.*, a Minnesota district court case finding that Anthem's utilization review nurses do not meet the learned profession exemption. 722 F. Supp. 3d 929 (D. Minn. 2024). *Learing*, however, expressly declined to follow *Isett* as an out-of-circuit case—something that this Court cannot do. *See id.* at 945–46. Specifically, *Learing* found that the utilization review work conducted by NMMs is "routine mental work" and not work that requires "consistent discretion and judgment." *Id.* at 945. That is the opposite conclusion of *Isett.* On a motion for reconsideration, the *Learing* court revised its holding and found a genuine issue of material fact on whether utilization review nurses met the learned profession exemption, letting the matter proceed to trial. *Learing v. Anthem Companies, Inc*., No. 21-CV-2283 (LMP) (DJF), 2025 WL 2322366, at *10 (D. Minn. Aug. 12, 2025). Here, because *Isett* controls and the factual analogies are determinate, Defendants have shown as a matter of law that Anthem has met all three prongs of the professional exemption under the FLSA. Because Plaintiffs were properly classified as exempt, they are not entitled to overtime wages. All claims are dismissed.

II.     **Motions to Seal Are Granted**

The parties have moved to seal a number of documents regarding Anthem and

Defendants' utilization management processes, audits, internal systems, and programs. ECF Nos.

125, 131, 137, 140, 151, 153, 160. No oppositions have been filed and the parties have conferred

to narrow the scope of the requests. Upon review, the Court finds that the documents at issue do

contain sensitive information on Anthem's internal processes and systems. "[C]ourts in this

District routinely permit parties to seal or redact commercially sensitive information in order to

protect confidential business and financial information." *See In re B & C KB Holding GmbH,*

No. 22-MC-180 (LAK) (VF), 2023 WL 2021299, *1 (S.D.N.Y. Feb. 14, 2023) (collecting cases).

Accordingly, the motions are granted. Documents that have been temporarily sealed pursuant to

these requests shall remain sealed.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

Plaintiffs' motion is DENIED. Motions regarding class certification and de-certification are

DENIED as moot. Motions to seal are GRANTED.

All claims are dismissed. The Clerk of Court is directed to terminate all outstanding

ECFs and to close the case.


Dated:  September 29, 2025
         New York, New York


                                        SO ORDERED.


                                        _____

                                        JESSICA G. L. CLARKE
                                        United States District Judge